**UNITED STATES of America**

v.

**Tyrone McEACHIN, Appellant.**

**No. 80–2512.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1981.

Decided Dec. 22, 1981.

Arthur Marc Levin, Washington, D. C. (appointed by this Court), for appellant.

Michael D. Hays, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and C. Madison Brewer, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before TAMM, WILKEY and ED-WARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Appellant Tyrone McEachin was arrested on August 21, 1980, when a police officer discovered a sawed-off shotgun during a warrantless search of McEachin's apartment. On October 24, 1980, in a bench trial before the District Court, McEachin was convicted of possessing an unregistered firearm and of possessing a firearm not identified by a serial number in violation of 26 U.S.C. § 5861(d), (i) (1976). On December 5, 1980, McEachin was sentenced to a five-year prison term for each count, to be served concurrently. He appeals the District Court's denial of his motion to suppress tangible evidence (*i.e.*, the sawed-off shotgun). His appeal raises two issues: (1) whether there was probable cause to search his apartment for the shotgun and (2) whether exigent circumstances justified the warrantless search. For the reasons set forth below, we affirm.

## I. FACTUAL BACKGROUND

The District Court held a hearing on appellant's motion to suppress on October 24,

1980. Officer William Oldham of the Metropolitan Police Department, the officer who searched appellant's apartment and arrested him, was the only person to testify at the suppression hearing. The basic factual chronology must, therefore, be gleaned from his testimony. *See* note 1 *infra.*

On or about August 1, 1980, Officer Oldham monitored a radio lookout for three suspects wanted in connection with an armed robbery that had occurred on that same date. One of the alleged robbers was described as carrying a sawed-off shotgun. Tr. 7–8.[1] Sometime during the evening of August 1, a person, referred to by the parties as "S–1,"[2] informed Oldham that a man named Tyrone, matching the description of one of the suspects in the lookout, was one of the robbers. S–1 did not know Tyrone's last name, but he did state that Tyrone's address was 462 K Street, N.W. He also informed Officer Oldham that Tyrone kept a sawed-off shotgun in a wardrobe closet in his room. Tr. 10–15. S–1 was not a witness to the robbery, and it is not clear how he obtained his information. Tr. 15, 17, 20. Officer Oldham testified that he considered seeking a warrant after speaking to S–1 but abandoned the idea because he concluded that he had insufficient information to establish probable cause. Tr. 15–16.

Within twenty-four hours of the robbery, Officer Oldham spoke to a second source, S–2, who also stated that a man named Tyrone had been involved in the robbery and had a shotgun. He gave the same general description of Tyrone as had S–1, and he also told Officer Oldham that Tyrone lived on the south side of the 400 block of K Street, N.W. Apparently, Officer Oldham did not believe that S–2 was a witness

to the robbery when he spoke to him. Furthermore, it is not clear from the record how S–2 obtained his information; according to Officer Oldham, S–2 stated only that he "had heard it." Tr. 20–21.

Approximately two weeks later, while investigating a homicide at 462 K Street, N.W., Officer Oldham examined a list of the tenants of that building and found the name Tyrone McEachin on the list. Tr. 22–23. About one week later, on August 20, 1980, Officer Oldham arrested another suspect in the robbery who provided no new information about McEachin. Tr. 23–24.

On August 21, 1980, between 2:00 p. m. and 3:00 p. m., Officer Oldham went to McEachin's apartment and spoke to him about the homicide that had occurred in McEachin's apartment building. Tr. 39. Between 3:00 p. m. and 4:00 p. m. on the same day, Officer Oldham spoke with three eyewitnesses to the robbery, S–3, S–4, and S–5, who told him that the robbery suspect who had already been arrested had played a passive role in the robbery and that McEachin had held the shotgun. They also provided McEachin's address and offered information about a third suspect in the robbery. Tr. 26–27. Apparently, these eyewitnesses referred Officer Oldham to a person standing nearby who offered no information but referred Oldham to yet another person, S–6, who was in the same general vicinity. Tr. 28–29.

At approximately 5:00 p. m. to 6:00 p. m. on August 21, Officer Oldham spoke with S–6. In their conversation, S–6 told Officer Oldham that McEachin had a sawed-off shotgun in his room and provided McEachin's address. He also stated that McEachin was nervous because the first suspect in the robbery had been arrested and that

1. "Tr." refers to the transcript of the suppression hearing and stipulated trial held on October 24, 1980. Immediately after the suppression hearing, appellant waived his right to trial by jury. Tr. 54–55. The parties stipulated that: (1) Officer Oldham's testimony at the suppression hearing should be deemed his testimony at trial, Tr. 56; (2) a twelve-gauge single-shot shotgun with a barrel length of fourteen and five-eighths inches and an overall length of twenty-two and one-half inches, whose serial

number had been eradicated, was found in appellant's apartment, Tr. 55–56; (3) a firearms specialist would testify that the weapon was not registered as required by law, Tr. 56–57; and (4) the shotgun had been test-fired by the police and was operable, Tr. 59.

2. The parties refer to the six confidential sources who gave information to Officer Oldham as S–1, S–2, S–3, S–4, S–5 and S–6.

McEachin was "going to move" or "get rid of" the shotgun. Tr. 30–31. Officer Oldham testified that S–6's statements were based on first-hand knowledge. Tr. 38.

After speaking with S–6, Officer Oldham looked for two other possible sources for approximately forty-five minutes. Tr. 31. Finally, at 7:15 p. m., Officer Oldham went to appellant's apartment, explained the purpose of his visit, and requested permission to search the premises. Appellant stated that the room was not his and that he could not give the officer permission to search it. Officer Oldham nevertheless entered the room with appellant, went directly to the wardrobe, and searched it. He found the sawed-off shotgun wrapped in paper on the floor of the wardrobe. Tr. 4–5, 31–34.

The District Court ruled that Officer Oldham had probable cause for a warrant to arrest McEachin and to search his apartment at approximately 4:00 p. m. on August 21, 1980 (after speaking with S–3, S–4, and S–5). The District Court further concluded that, at approximately 6:00 p. m., when Officer Oldham learned from S–6 that appellant was about to move or get rid of the shotgun, the officer was faced with exigent circumstances which justified his warrantless entry and search. On this basis, the District Court denied appellant's motion to suppress. Tr. 47.

## II. PROBABLE CAUSE

### A. *The General Test of Probable Cause Based on Information From Unidentified Police Informants*

■ As a general rule, "probable cause exists when known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that an offense has been or is being committed." *United States v. Davis*, 458 F.2d 819, 821 (D.C.Cir. 1972). In the case of a search, "[p]robable cause exists when circumstances known to a police officer are such as to warrant a person of reasonable caution in the belief that a search would reveal incriminating evidence." *United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C.Cir.1978) (per cu-

riam), *cert. denied*, 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979).

■ In *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the Supreme Court delineated the requirements for establishing probable cause for a search warrant based on hearsay information from an unidentified police informant. An affidavit for a warrant in such a case must describe some of the underlying circumstances showing (1) the basis of the informant's information, and (2) the informant's general credibility or the reliability of the information he has provided. *Id.* at 114, 84 S.Ct. at 1513–14. In *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Court stated that an informant's tip may be used to establish probable cause if it is corroborated by independent sources and if the corroborated tip is as reliable as one that meets the two-pronged *Aguilar* test. *Id.* at 415, 89 S.Ct. at 588. The same general probable cause standards also apply to warrantless searches and arrests. *See, e.g., McCray v. Illinois*, 386 U.S. 300, 304, 87 S.Ct. 1056, 1058, 18 L.Ed.2d 62 (1967); *United States v. Brennan*, 538 F.2d 711, 720 (5th Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977); *United States v. Carter*, 498 F.2d 83, 85 (D.C.Cir.1974) (per curiam).

### B. *Application of the* Aguilar-Spinelli *Test in This Case: Assessing the Basis and Credibility of Information Furnished by Unidentified and Disinterested Eyewitness Sources*

■ After carefully reviewing the record in this case, we hold that the District Court correctly found that the information available to Officer Oldham provided him with probable cause to enter and search appellant's apartment. Specifically, we conclude that the first-hand information obtained from the three eyewitnesses to the robbery (S–3, S–4 and S–5) and from S–6 gave Officer Oldham probable cause to search appellant's apartment.

We have little difficulty concluding that the information provided by these sources

meets the two-pronged *Aguilar-Spinelli* test. The first prong of the test is clearly satisfied because each source's information was based on direct, personal observation or first-hand knowledge.[3] *See, e.g., United States v. Holmes*, 594 F.2d 1167, 1170 (8th Cir.), *cert. denied*, 444 U.S. 873, 100 S.Ct. 154, 62 L.Ed.2d 100 (1979); *United States v. Lee*, 581 F.2d 1173, 1177 (6th Cir.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 725, 58 L.Ed.2d 707 (1978); *United States v. Watts*, 540 F.2d 1093, 1095 (D.C.Cir.1976).

As to the credibility prong, we note that many courts have suggested that it may be inappropriate to rigidly apply this aspect of the test to information offered by disinterested eyewitnesses (as distinguished from professional informants).[4] While we are inclined to agree that, as a general proposition, the credibility prong of the *Aguilar-Spinelli* test should be applied with some measure of leniency in cases involving first-hand information from allegedly disinterested persons, we do not hold that such information must always be found credible. In the instant case, however, we have no reason to reject the judgment of the District Court that the information upon which Officer Oldham acted was credible. It is unrefuted on this record that the information furnished to Officer Oldham was based on the direct observations of four disinterested persons who had no apparent motive to falsify their statements. It is also undisputed that Officer Oldham had no reason or motive to fabricate about the information given to him by the disinterested eyewitnesses. If anything, Officer Oldham was scrupulously cautious in securing and corroborating information before proceeding to act against the appellant. These factors, we believe, are sufficient to satisfy the credibility prong of the *Aguilar-Spinelli* test.

The four eyewitness sources provided appellant's name and address, which Officer Oldham independently corroborated, described appellant's role in the robbery, and stated that he had a sawed-off shotgun in his apartment. This information, coupled with the information in the robbery lookout monitored by Officer Oldham, was sufficient "to warrant a person of reasonable caution in the belief that a search" of appellant's apartment "would reveal incriminating evidence." *United States v. Hawkins*, 595 F.2d at 752 n.2.

As a result of our disposition of this issue we need not reach the question whether the information provided by S–1 and S–2 meets

---

**3.** Appellant contends that none of the six sources were proven to be eyewitnesses. The District Court, however, found that S–3, S–4 and S 5 were eyewitnesses to the robbery, Tr. 42, despite Officer Oldham's somewhat ambiguous testimony on this question. We accept the court's finding because it is not clearly erroneous. Officer Oldham testified that the information provided by S–6 was based on "first-hand knowledge." Tr. 38. Although the District Court made no finding of fact on this point, appellant did not challenge Officer Oldham's testimony, and we therefore accept it as supported by the record.

**4.** *See, e.g., United States v. Pennington*, 635 F.2d 1387, 1391 (10th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981) (more lenient test of reliability for eyewitness observations of private citizens than for tips from professional informant); *United States v. Melvin*, 596 F.2d 492, 497 (1st Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979) (usual demonstration of credibility and reliability not required for non-accu- satory statement of bystander witness); *United States v. McCrea*, 583 F.2d 1083, 1085 (9th Cir. 1978) (reasonable to rely on "good faith observations" of "known private citizens"); *United States v. Banks*, 539 F.2d 14, 17 (9th Cir.), *cert. denied*, 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976) ("detailed eyewitness report of a crime is self-corroborating; it supplies its own indicia of reliability"); *United States v. Burke*, 517 F.2d 377, 380 (2d Cir. 1975) (noting "growing recognition that ... *Aguilar* and *Spinelli* [were] addressed to the particular problem of professional informers and should not be applied in a wooden fashion to ... information ... from an alleged victim of or witness to a crime"); *United States v. Bell*, 457 F.2d 1231, 1238–39 (5th Cir. 1972) (*Aguilar-Spinelli* requirements limited to informants only; eyewitnesses "by definition are not passing along idle rumor"); *McCreary v. Sigler*, 406 F.2d 1264, 1269 (8th Cir.), *cert. denied*, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969) (unidentified eyewitness to crime demonstrates sufficient reliability and may have "built-in credibility guides").

the *Aguilar-Spinelli* standards.[5] We note, however, that Officer Oldham was not required to disregard the information furnished by S–1 and S–2. Even if the information from S–1 and S–2 alone would have been inadequate to establish probable cause, it was permissible to include it in the probable cause calculus, particularly since it was consistent with the information given by the other sources.[6]

## III. EXIGENT CIRCUMSTANCES

### A. *"Exigent Circumstances" as a Justification for the Warrantless Search*

■■■ Even if supported by probable cause, warrantless searches are *"per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *United States v. McClinnhan,* 660 F.2d 500, 503 (D.C.Cir.1981) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). One recognized exception is the presence of exigent circumstances necessitating an immediate search—for example, when contraband or evidence of a crime is threatened with imminent removal or destruction. *See, e.g., United States v. Hendrix,* 595 F.2d 883, 886 (D.C.Cir.1979) (per curiam); *United States v. Carter,* 522 F.2d 666, 673 (D.C.Cir.1975). In determining whether the Government

has met its burden of demonstrating that the " 'exigencies of the situation' made a warrantless search 'imperative,' " *United States v. Martin,* 562 F.2d 673, 676 (D.C.Cir. 1977) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971)), we must be guided "by the realities of the situation presented by the record." *United States v. Robinson,* 533 F.2d 578, 581 (D.C.Cir.1976) (en banc).

■■■ After carefully reviewing the record before us, we conclude that Officer Oldham was faced with exigent circumstances as soon as he learned from S–6 that appellant was going to dispose of the shotgun in his apartment. At that time an immediate search of appellant's apartment would have been justified in order to prevent imminent removal of contraband and evidence of a crime. The exigency was heightened by the fact that the evidence about to be removed was a deadly weapon. *See, e.g., United States v. Allison,* 639 F.2d 792, 794 (D.C.Cir.1980); *United States v. McKinney,* 477 F.2d 1184, 1186 (D.C.Cir.1973) (per curiam).

Appellant argues that the finding of exigent circumstances in this case was incorrect because the Government failed to satisfy the requirements of *Dorman v. United States,* 435 F.2d 385 (D.C.Cir.1970) (en banc).[7] We find, however, that the case law in this Circuit—including the decision

---

**5.** The Government argues that the information provided by S-1 and S-2 satisfies the *Aguilar-Spinelli* requirements because (1) it was very detailed, (2) Officer Oldham independently corroborated parts of it, (3) it was consistent with the information given by the other sources, (4) S 1 and S-2 had no motive to lie and were vulnerable to possible retaliation by appellant, and (5) appellant's lie to Officer Oldham about his apartment indicated the veracity of their information.

**6.** *See, e.g., United States v. Weinrich,* 586 F.2d - 481, 490 (5th Cir. 1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979); *United States v. Hyde,* 574 F.2d 856, 863 (5th Cir. 1978) (mutually reinforcing and corroborative information from several informants adds significantly to probable cause, even though reliability of individual sources not established).

**7.** In particular, appellant argues that the Government failed to satisfy the *Dorman* crite-

rion that "there exist[ed] not merely the minimum of probable cause, that is requisite even when a warrant has been issued, but beyond that a *clear showing of probable cause,* including 'reasonably trustworthy information,' to believe that the suspect committed the crime involved." 435 F.2d at 392–93 (emphasis added) (footnotes omitted). We need not decide here whether there has been such a "clear showing" because, under *Dorman,* this is but one of several factors relevant in determining whether exigent circumstances exist. All of the other factors listed in *Dorman, id.,* are present in this case: a "grave offense" was involved (*see United States v. McKinney,* 477 F.2d at 1186 (possession of sawed-off shotgun is grave offense under *Dorman* )); the suspect was reasonably believed to be armed; there was strong reason to believe the evidence sought was in the premises being searched; there was a likelihood that the evidence would be lost if not swiftly seized; entry was peaceful; and the entry and search did not take place at night.

in *Dorman* (see note 7 *supra*)—compels a finding of exigent circumstances given the Government's showings in this case. In *United States v. McKinney*, 477 F.2d 1184 (D.C.Cir.1973) (per curiam), for example, the police conducted a warrantless search of the defendant's hotel room after the hotel management inadvertently discovered a sawed-off shotgun in the defendant's room. The court held that exigent circumstances justified the warrantless search, even though the defendant was not in his room at the time of the search. In *United States v. Allison*, 639 F.2d 792 (D.C.Cir.1980), the court upheld a similar warrantless search. In *Allison* a narcotics dealer who shared a motel room with the defendant was arrested for selling heroin. After being arrested, he told the police that the defendant had drugs and a gun in his motel room but was likely to dispose of them immediately because he had learned of his roommate's arrest. The court found these circumstances exigent and upheld the police's subsequent warrantless search of the defendant's motel room, again despite the fact that the room was unoccupied at the time of the search. The court stated that the police could not have been certain that the room was empty before searching it, and noted that staking out the premises while obtaining a warrant would have risked loss of evidence and endangered the police. It also found that "[t]he presence of the gun made the situation more pressing and the emergency more critical because it constituted a possible 'threat to human life.'" *Id.* at 794 (quoting *United States v. Hendrix*, 595 F.2d 883, 886 (D.C.Cir.1979) (per curiam)). Finally, it concluded that the facts of the case presented a strong showing of probable cause, a factor which supported its finding of exigent circumstances. *Id.* In our view, *Allison* and *McKinney* are controlling here.

B. *Factors Allegedly Nullifying the Existence of "Exigent Circumstances"*

Appellant also contends that, if exigent circumstances existed, Officer Oldham con-

tributed to them himself by failing to investigate quickly and diligently his leads concerning appellant's possession of a shotgun, by failing to contact an Assistant United States Attorney for advice about whether to procure a warrant or to proceed without one, and by his ignorance of established procedures for obtaining a telephonic warrant under Rule 41(c)(2), Fed.R.Crim.P.[8] We find no merit in these arguments.

1. *Officer Oldham's Alleged Lack of Diligence in Pursuing The Investigation*

■ First, the District Court did not find, and we cannot say on the basis of the record before us, that Officer Oldham's investigation lacked diligence or reasonableness. Nor can we say that his decision not to seek a warrant earlier in his investigation was improper or unreasonable under the circumstances. The wisdom *vel non* of Officer Oldham's investigatory decisions in this case does not affect our conclusion that the circumstances became exigent between 5:00 p. m. and 6:00 p. m. on August 21, 1980, when he learned from S–6 that appellant was likely to dispose of the shotgun.

The fact that Officer Oldham did not search appellant's apartment until 7:15 p. m. that evening also does not undercut our finding of exigent circumstances. *See, e.g., United States v. Whitfield*, 629 F.2d 136, 141–42 (D.C.Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981) (where probable cause and exigent circumstances existed, delay before search did not eliminate exigent circumstances even if delay was long enough to obtain a warrant); *United States v. Johnson*, 561 F.2d 832, 842, 844 (D.C.Cir.) (en banc), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977) (half-hour delay before conducting warrantless search did not terminate probable cause or exigent circumstances).

■ Second, we do not consider Officer Oldham's failure to contact an Assistant

---

8. Rule 41(c) was amended in 1977 to provide a procedure for issuing a warrant "based upon sworn oral testimony communicated by telephone or other appropriate means" where "the circumstances make it reasonable to dispense with a written affidavit." Fed.R.Crim.P. 41(c)(2)(A).

U.S. Attorney a critical error. While the fact that an officer seeks advice from a prosecutor before conducting a warrantless search may support a finding that his decision to proceed without a warrant is reasonable, e.g., *United States v. Allison,* 639 F.2d at 794; *United States v. Johnson,* 561 F.2d at 843, failure to contact a prosecutor does not preclude a finding of exigent circumstances. In this case, exigent circumstances justified an immediate, warrantless search; Officer Oldham's failure to seek prior advice from a prosecutor did not make the circumstances less exigent or the search less reasonable.

### 2. The Availability of A Telephonic Warrant Under Rule 41(c)(2)

We are more troubled, however, by Officer Oldham's apparent ignorance of the procedure for obtaining a telephonic warrant and by the Government's failure to introduce any evidence on the availability of such a warrant in this case. The amount of time necessary to obtain a warrant by traditional means has always been considered in determining whether circumstances are exigent. *See, e.g., United States v. Allison,* 639 F.2d at 794 (difficulty of obtaining search warrant during the night adds to exigent circumstances); *United States v. Hendrix,* 595 F.2d at 886 (exigent circumstances exist where obtaining warrant would take "at least a few hours"); *United States v. Johnson,* 561 F.2d at 843 & n.12

(finding exigent circumstances exist where procuring warrant would take one and a half to two hours and praising congressional approval of amendment to Rule 41(c) allowing telephonic warrants). We think courts must also consider the amount of time necessary to obtain a warrant by telephone in determining whether exigent circumstances exist. Procuring a warrant by telephone generally will take less time than procuring one by the traditional means of appearing before a magistrate.[9] We recognize, of course, that the time involved in obtaining a telephonic warrant will vary from case to case [10] and that in certain cases, such as this one, the exigencies of the situation will preclude even the shortest possible delay in obtaining a warrant.

The legislative history of the 1977 Amendment to Rule 41(c), allowing for telephonic warrants, indicates that Congress intended to encourage police to use the telephonic warrant procedure, particularly where the existence of exigent circumstances is a close question and the police might otherwise conduct a warrantless search. The Advisory Committee Note to the 1977 Amendment stated:

> Use of search warrants can best be encouraged by making it administratively feasible to obtain a warrant when one is needed. One reason for the nonuse of the warrant has been the administrative difficulties involved in getting a warrant,

**9.** The court in *United States v. Hawkins,* 595 F.2d 751, 753 n.4 (D.C.Cir.1978) (per curiam), *cert. denied,* 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979), noted: "Even the newly-promulgated procedure for obtaining a search warrant by telephone, Fed.R.Crim.P. 41(c)(2), requires time before the warrant can be issued, for an officer pursuing that course must first prepare a 'duplicate original warrant,' to be read verbatim to the federal magistrate requested to issue it. Fed.R.Crim.P. 41(c)(2)(B)." Nonetheless, the procedure will frequently be more convenient and less time consuming than appearing personally before a magistrate. *See, e.g., Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 1652, 68 L.Ed.2d 38 (1981) ("In routine search cases . . . the short time required to obtain a search warrant from a magistrate will seldom hinder efforts to apprehend a felon. . . . [I]f a magistrate is not nearby, a telephonic search warrant can usually be

obtained."); *United States v. Whitfield,* 629 F.2d 136, 142 (D.C.Cir.1980) ("with telephonic warrants now permissible . . . the delay [in obtaining a warrant] may not be long at all"); *United States v. Baker,* 520 F.Supp. 1080, 1083 (S.D.Iowa 1981) (agents had inadequate time to travel to magistrate to get warrant but had abundant time to obtain one by telephone).

**10.** *Compare United States v. Hackett,* 638 F.2d 1179, 1184–85 (9th Cir. 1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) (20–30 minutes inadequate to obtain telephonic warrant where police are pursuing suspect in a car), *with United States v. Baker,* 520 F.Supp. 1080, 1083–84 (S.D.Iowa 1981) (one hour and 15 minutes is "abundant time" to obtain warrant by telephone, a process which takes not more than 30 minutes).

particularly at times of the day when a judicial officer is ordinarily unavailable.... Federal law enforcement officers are not infrequently confronted with situations in which the circumstances are not sufficiently "exigent" to justify the serious step of conducting a warrantless search of private premises, but yet there exists a significant possibility that critical evidence would be lost in the time it would take to obtain a search warrant by traditional means.

. . . .

... The unavailability of [a telephonic warrant] procedure ... makes more tempting an immediate resort to a warrantless search in the hope that the circumstances will later be found to have been sufficiently "exigent" to justify such a step.

Fed.R.Crim.P. 41(c)(2), Notes of Advisory Committee on Rules, 1977 Amendment, *reprinted in* 18 U.S.C.App., at 1672–73, 1674 (Supp. III 1979) (citations omitted). Both the House and the Senate Reports specifically referred to this language and stated that the purpose of the proposed amendment was "to encourage Federal law enforcement officers to seek search warrants in situations when they might otherwise conduct warrantless searches." S.Rep.No. 354, 95th Cong., 1st Sess. 10, *reprinted in* [1977] U.S.Code Cong. & Ad.News 527, 534; H.R.Rep.No.195, 95th Cong., 1st Sess. 10 (1977). Indeed, one of the concerns of the House was that the proposed amendment might not have "the intended result of encouraging the use of warrants." H.R.Rep. No.195, at 11; *see* 123 Cong.Rec. 11,110 (1977).

 Consistent with Congress' intent, we believe that the courts must consider the availability of a telephonic warrant in determining whether exigent circumstances existed,[11] unless it is clear that the exigency in a particular case was so great that it precluded recourse to any warrant procedure, however brief. Because the Government bears the burden of proving the existence of exigent circumstances, it must ordinarily introduce evidence on the availability of a telephonic warrant and on the time required to obtain one.

We think the court in *United States v. Baker*, 520 F.Supp. 1080 (S.D.Iowa 1981), analyzed this issue properly. In that case, federal agents from the Drug Enforcement Administration arranged for the purchase of drugs at a suspect's home. The suspect subsequently changed his mind about the location of the transaction and sent his girlfriend to deliver the drugs to another person's home. The agents arrested his girlfriend when she arrived with the drugs and then drove to the suspect's home. Without a warrant, the agents entered and arrested the suspect and searched him and his home. The court held that exigent circumstances did not excuse their failure to obtain a warrant because there was adequate time to procure one by telephone. Rejecting the Government's unsupported assertion that obtaining a warrant by telephone would have taken almost as long as obtaining one in person, the court explained:

At 3:00 p. m. or a few minutes thereafter, the agents had probable cause to arrest [the suspect], and they had reasonable grounds to believe that he might become alarmed and destroy evidence in his home and flee if [his girlfriend] did not return to his home by about 4:45 p. m. Deducting the 25 to 30 minutes time required to travel ... to [the suspect's] home, the agents still had nearly an hour and 15 minutes left in which to seek and obtain a warrant. This was inadequate time to travel to Des Moines to get a warrant, but it was abundant time in which to seek and obtain a warrant from a federal magistrate by telephone.

. . . .

11. *See* Marek, *Telephonic Search Warrants: A New Equation for Exigent Circumstances,* 27 Clev.St.L.Rev. 35 (1978) (arguing that with telephonic warrants now available courts must scrutinize more closely Government claims that exigent circumstances justified a warrantless search and that federal courts may use their supervisory power to enforce compliance with the Federal Rules of Criminal Procedure to exclude evidence obtained in disregard of Rule 41(c)(2)).

Because the agents did not try to obtain a telephone warrant, for which there was abundant time, the government has failed to establish exigent circumstances. *Id.* at 1083, 1084.

 The court in *Baker* noted, however, that "if time constraints do not permit obtaining a warrant" at all, *id.* at 1084, the Government may proceed without one. We find that such time constraints permitted the warrantless search in this case. Neither Officer Oldham's ignorance of the telephonic warrant procedures nor the Government's failure to introduce evidence on the availability of a telephonic warrant alters our decision that exigent circumstances existed. As discussed above, once Officer Oldham learned that appellant was about to dispose of the shotgun, an immediate warrantless search of appellant's apartment would have been justified, even if a telephonic warrant had been readily available. In this case, unlike *Baker*, the difference in the amount of time required to obtain a warrant by telephone rather than by submitting a written affidavit to a magistrate was not relevant in determining whether exigent circumstances existed.

## IV. CONCLUSION

We conclude that Officer Oldham's warrantless search of appellant's apartment was supported by probable cause and justified by exigent circumstances. Consequently, we affirm the District Court's denial of appellant's motion to suppress.

*So ordered.*